1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CURTIS J. WILLIAMS,                      No.  2:12-cv-0318 JAM KJN P

12              Plaintiff,

13        v.                                  FINDINGS AND RECOMMENDATIONS

14   C/O T. YOUNG, et al.,

15              Defendants.

16

17   I.  Introduction

18        Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff claims that defendants

19   Sharp, Fish, Hanks, and Beasley used excessive force by pepper-spraying him nine separate

20   times, emptying their canisters of spray each time, and that defendants Young and Van Leer

21   failed to protect plaintiff from such excessive force, in violation of the Eighth Amendment.

22   Defendants' motion for summary judgment is before the court.  As set forth more fully below, the

23   undersigned finds that defendants' motion for summary judgment should be denied.

24   II.  Plaintiff's Amended Complaint

25        In his verified amended complaint, plaintiff claims he is legally blind/visually impaired,

26   and that when he attends yard he is required to wear a bright neon green vest that has "visual

27   impaired" on the back.  While housed at High Desert State Prison ("HDSP"), on July 28, 2009,

28   while wearing the neon green vest, plaintiff was on the yard and approached defendant T. Young,

1

1    who was walking across the yard leaving work, allegedly so plaintiff could find out why Booth

2    Officer Young had been "picking on" plaintiff in the building.  (ECF No. 8 at 6.)  Plaintiff alleges

3    the following verbal exchange occurred between plaintiff and defendant Young:

4         P:  "Why do you have a problem with me?"

5         Young:  "No, you just need to comply with the program."

6         P:  "I don't want any problems with you.  So are we cool?"

7         Young:  "We're cool."

8    (Id.)  Plaintiff turned around to walk away, and defendant Young yelled "Get down," and

9    activated a Code 1 alarm on Facility B yard.  Plaintiff claims everyone, including him, got down,

10   and plaintiff looked around to see what caused the alarm.  (ECF No. 8 at 6-7.)  Plaintiff saw

11   officers start running toward him telling him to get in a prone position.  (ECF No. 8 at 7.)

12   Plaintiff alleges he laid on his stomach with his hands to the sides and his legs straight, but when

13   ordered to cross his hands and legs, he crossed his hands behind his back but did not cross his

14   legs because he still had knee pain from recent knee surgery.  (Id.)   Plaintiff alleges that because

15   he would not cross his legs, defendant Sharp sprayed pepper spray in plaintiff's face while he was

16   prone on the ground with his hands crossed behind his back.  When defendant Sharp sprayed him,

17   plaintiff turned around and sat up so the spray would hit his back and to protect his eyes.  After

18   the canister was empty, plaintiff laid back down on his stomach with his arms and legs straight

19   out.  Plaintiff was again ordered to cross his arms, which he did, and to cross his legs, which he

20   did not.  Defendant Fish then pepper sprayed plaintiff a second time in the face.  Plaintiff sat up

21   and turned his back to the spray to protect his eyes, and when the canister was empty, he laid on

22   his stomach with his arms and legs straight out.  (ECF No. 8 at 8.)  Plaintiff was again ordered to

23   cross his arms behind his back, which he did, and to cross his legs, which he did not.  (ECF No. 8

24   at 9.)  Defendant Hanks attempted to spray plaintiff again (a third time) but his spray can

25   malfunctioned, so he retrieved another canister from an unidentified officer and sprayed plaintiff

26   in the face a third time.  Plaintiff sat up on his butt and turned so the spray would hit his back and

27   not his eyes.  When the canister was empty, plaintiff laid back down on the ground with his arms

28   and legs straight out.  Plaintiff was again ordered to cross his arms behind his back, which he did,

2

and to cross his legs, which he did not.  Then, defendant Beasley sprayed plaintiff in the face for the fourth time.  Plaintiff sat up on his butt and turned so the spray hit his back and he could protect his eyes.  (ECF No. 8 at 9.)  When the canister was empty, plaintiff laid back down with his arms and legs straight out.  (ECF No. 8 at 10.)  Plaintiff was again ordered to cross his arms, which he did, and to cross his legs, which he did not.  Defendant Hanks then pepper sprayed plaintiff in the face for the fifth time, with the same responses from plaintiff as set forth above. Defendant Beasley and Hanks each sprayed plaintiff in the face two more times, for a total of nine alleged separate instances of pepper-spraying, with plaintiff responding in the same fashion. Finally, after allegedly watching this series of events, defendant Lt. D. Van Leer gave an order for officers to place plaintiff in handcuffs.  (ECF No. 8 at 12.)  Plaintiff declares that he never attempted to get to his feet before or after being pepper-sprayed.  (ECF No. 8 at 30.)  Plaintiff further avers that this incident started because defendant Young thought plaintiff contemplated assaulting defendant Young, even though plaintiff made no movement or gesture to indicate that was plaintiff's intention.  (ECF No. 8 at 31.)

Plaintiff contends that defendants Sharp, Fish, Hanks, and Beasley used excessive force in restraining plaintiff, and that defendants Young and Van Leer failed to protect plaintiff from the use of excessive force.

III.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the grounds that because plaintiff refused to obey all of their orders, the use of force by defendants Beasley, Fish, Hanks, and Sharp was justified, and defendants Van Leer and Young were not deliberately indifferent to any risk of harm to plaintiff's health or safety.  In addition, defendants argue that they are entitled to qualified immunity because they could have reasonably believed that their conduct was lawful.

Plaintiff contends that the use of force was excessive because he complied with orders to get down, prone out, and cross his arms behind his back, so he posed no threat to defendants' safety.  In support of his position, plaintiff quotes Treats v. Morgan, 308 F.3d 868, 873 (8th Cir. 2002):

////

3

1

> use of pepper spray will not be justified every time an inmate
> questions orders or seeks redress for an officer's actions . . . . A
> basis for an Eighth Amendment claim exists when, as alleged here,
> an officer uses pepper spray without warning on an inmate who
> may have questioned his actions but who otherwise poses no threat.

2

3

4   Id.

5         In reply, defendants argue that notwithstanding that the parties are mainly in agreement

6   regarding the chain of events underlying the claims herein, plaintiff concedes that he did not

7   comply with all of the orders, admitting that he repeatedly refused orders to cross his legs after he

8   got into the prone position, and did not remain prone while he was pepper sprayed, instead

9   repeatedly sitting up and turning away from the pepper spray. Defendants contend it was

10  plaintiff's repeated refusal to follow orders that caused defendants to believe that plaintiff posed a

11  threat to their safety. In addition, despite the fact that plaintiff had knee surgery in January of

12  2009, defendants point out that plaintiff did not allege in his complaint, declaration, or opposition,

13  that he informed defendants that he was unable to cross his legs because he recently underwent

14  knee surgery. Plaintiff conceded that on July 28, 2009, he had no mobility impairment and was

15  not wearing a mobility vest that would have put defendants on notice of such condition or

16  impairment. Moreover, defendants provide declarations stating that they did not hear plaintiff or

17  any officer say that the reason plaintiff could not or would not cross his legs on July 29, 2009,

18  was because he recently underwent knee surgery.

19      A.  <u>Legal Standard for Summary Judgment</u>

20        Summary judgment is appropriate when it is demonstrated that the standard set forth in

21  Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the

22  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

23  judgment as a matter of law." Fed. R. Civ. P. 56(a).

24

>    Under summary judgment practice, the moving party always
> bears the initial responsibility of informing the district court of the
> basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

25

26

27

28  ////

4

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

////

1       In the endeavor to establish the existence of a factual dispute, the opposing party need not

2    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

5    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

6    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

7    amendments).

8       In resolving a summary judgment motion, the court examines the pleadings, depositions,

9    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

10   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

11   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

12   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

13   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

14   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

15   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

16   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

18   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

19   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

20      By contemporaneous notice provided on July 3, 2014 (ECF No. 42), plaintiff was advised

21   of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of

22   Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

23   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

24   ////

25   ////

26   ////

27   ////

28   ////

B. Facts[1]

1.  At all relevant times, plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and housed at High Desert State Prison ("HDSP") on July 28, 2009, during the incident at issue herein.

2.  Plaintiff was diagnosed with glaucoma, Schnyder's Dystrophy, and Cone-Rod Dystrophy before July 28, 2009.

3.  Plaintiff is able to read with prescription glasses.

4.  Due to his visual impairment, plaintiff is required to wear a green vest that has "Vision Impairment" written on the back of it whenever he leaves his cell.

5.  Plaintiff was assigned to Facility B, Building 4 (B4) at HDSP on July 28, 2009.

6.  Defendant Officer Young was the control booth officer in B4 at HDSP on July 28, 2009.

7.  Plaintiff had surgery on his right knee in January 2009.

8.  The purpose of using pepper spray on an inmate is to cause the inmate to have a physical reaction to the spray that reduces his ability to continue his resistive, aggressive, hostile, or noncompliant behavior.

9.  The physical reactions a person typically experiences when the face is exposed to pepper spray are an inability to keep the eyes open, mucous discharged from the nose, difficulty breathing, coughing, sneezing, disorientation, and a burning sensation on the affected skin.

10.  Defendants Hanks, Beasley, and Van Leer aver that based on their training and experience, correctional officers are authorized to use any amount of pepper spray necessary to stop a threat or to gain an inmate's compliance with orders.[2]

---

[1]  For purposes of the instant motion for summary judgment, the court finds the following facts undisputed, unless otherwise indicated.  Documents submitted as exhibits are considered to the extent they are relevant, and despite the fact that they are not authenticated because such documents could be admissible at trial if authenticated.

[2]  Defendants do not cite a particular regulation for such authority.  But the court notes that prison regulations were amended on October 30, 2014, to provide that when a chemical agent is used in a large area, "it may be necessary to administer chemical agents in a larger quantity and more frequently than would occur during a controlled use of force in a small space.  California

1    11.  The face and head are the best targets for striking someone with pepper spray when

2    the goal is to subdue because this will cause the person to feel the full effect of the spray.

3    12.  If an inmate is resisting officers or disobeying orders, spraying him in the legs or back

4    or anywhere other than the facial area will not cause him to have a physical reaction that will

5    prevent him from continuing his resistive or noncompliant behavior.

6    13.  Based on their training on the use of pepper spray and their experience in using

7    pepper spray, it is the understanding of defendants Van Leer and Young that there are no long-

8    term effects experienced by people who are exposed to pepper spray, whether they are exposed to

9    a one-second burst of pepper spray or to hundreds of consecutive bursts.

10    14.  On July 28, 2009, plaintiff approached defendant Young on the exercise yard on

11    Facility B ("B yard") about fifty feet in front of the program office.

12    15.  Defendant Young had just relinquished all of his assigned equipment before walking

13    through B yard to go to the program office to sign out for the day, and the only item he had in his

14    possession other than the uniform he was wearing was a nylon lunch bag.

15    16.  Plaintiff wanted to talk to defendant Young because he felt that Young was picking

16    on plaintiff; that Young had singled plaintiff out by asking officers in B4 to confiscate his cup of

17    water on a couple of occasions recently while allowing other inmates to keep their cups of water.

18    (Pl.'s Depo. 17:1-18:1; 19:3-9.)

19    17.  Plaintiff and Young had a brief conversation on B yard.

20    18.  Defendant Young felt that plaintiff's comments during the conversation were a direct

21    threat to his personal safety.

22    19.  Defendant Young yelled, "Get down," and put his hand up in the air for the yard

23    observation officer to see him from his tower.

24    20.  Plaintiff sat down on the ground after defendant Young yelled for him to get down.

25    ////

26    ////

27

28    Department of Corrections & Rehabilitation Department Operations Manual § 51020.15.2.

21.  An officer in the B yard tower issued an order through a loud speaker for all of the inmates on the yard to get down.  In his report, B Yard Observation Officer Boyd noted that "all inmates complied with my order to get down."  (ECF No. 8 at 44.)

22.  Other officers ran to defendant Young's location after he yelled for the yard to get down.

23.  Defendant Sharp was the first officer to respond to defendant Young's location. Plaintiff was sitting on the ground when Sharp arrived.  (ECF No. 40 at 5.)

24.  Defendants Young and Sharp ordered plaintiff to prone out on the ground.

25.  Plaintiff understood that to "prone out" means to lie on his stomach with his arms and legs out.

26.  Plaintiff obeyed the order to prone out.  Plaintiff contends that he could have been handcuffed at this point, and that had he been handcuffed at this point, the use of pepper spray would not have been necessary.

27.  When plaintiff got on the ground, there were other inmates on the yard and near him.

28.  The other inmates were moved away from plaintiff, but remained on the yard during the incident.

29.  Defendants Young and Sharp ordered plaintiff to cross his arms behind his back and to cross his legs.

30.  Plaintiff understood that to "cross his legs" means to put one foot over the other foot so that his ankles are crossed over each other.

31.  Plaintiff crossed his arms as ordered but refused to cross his legs.

32.  Young and Sharp again ordered plaintiff to cross his legs.

33.  Plaintiff refused to cross his legs.

34.  Young felt that plaintiff posed a threat to any officer who would have tried to handcuff him without first subduing him with pepper spray.  Plaintiff denies he was a threat because he was laying on the ground with his arms crossed and his legs out.

35.  Sharp felt that plaintiff posed a threat to any officer who would have tried to handcuff him without first subduing him with pepper spray.  Plaintiff denies he was a threat because he

1   was laying on the ground with his arms crossed and his legs out.

2   36.  Sharp sprayed plaintiff in the face and eyes with pepper spray because plaintiff would

3   not obey orders to cross his legs.  Sharp emptied his can of pepper spray on plaintiff.  (ECF No.

4   34-5 at 1.)

5   37.  It did not appear to Sharp that the pepper spray had any effect on plaintiff.  Plaintiff

6   disputes Sharp's claim because he contends the potential harm of pepper spraying a vision-

7   impaired person in the eyes is obvious, and claims that he sat up during the spray to protect his

8   eyes, but that he immediately proned out again once the spray stopped.

9   38.  Defendant Fish saw Sharp pepper spray plaintiff, but it did not appear to Fish that the

10   spray had any effect on plaintiff.

11   39.  Plaintiff sat up and turned his body so that the pepper spray would hit him in the back.

12   40.  Plaintiff proned out again after Sharp stopped spraying him with pepper spray.

13   41.  Officers ordered plaintiff to cross his arms and legs after he proned out, but plaintiff

14   refused to cross his legs.

15   42.  Defendant Fish felt that plaintiff posed a threat to any officer who would have tried to

16   handcuff him without first subduing him with pepper spray.  Plaintiff denies he was a threat

17   because he was laying on the ground with his arms crossed and his legs out.

18   43.  Defendant Fish declares that he sprayed plaintiff in the facial area because plaintiff

19   did not fully comply with her orders.  Plaintiff claims defendant Fish sprayed plaintiff because

20   plaintiff refused to cross his legs.  (ECF No. 40 at 7.)

21   44.  It did not appear to Fish that her pepper spray had any effect on plaintiff.  Plaintiff

22   disputes Fish's claim because he contends the potential harm of pepper spraying a vision-

23   impaired person in the eyes is obvious, and claims that he sat up during the spray to protect his

24   eyes, but that he immediately proned out again once the spray stopped.

25   45.  When defendant Hanks came into contact with plaintiff on B yard, plaintiff was

26   sitting on the ground in front of defendants Sharp and Young, and plaintiff had pepper spray on

27   his face and upper body.

28   46.  It did not appear to Hanks that the pepper spray had any effect on plaintiff.

10

47.  Based on the circumstances, defendant Hanks did not feel that it was safe to approach plaintiff with handcuffs until after the pepper spray subdued him.  Plaintiff denies he was a threat because he was sitting on the ground.

48.  Defendant Hanks ordered plaintiff to prone out, cross his legs, and place his hands behind his back.

49.  Defendant Hanks claims that plaintiff did not comply with any of his orders.  Plaintiff claims that the only order to which he failed to comply was Hanks' order to cross plaintiff's legs.  Defendant Hanks pepper sprayed plaintiff in the face and upper body.  After Hanks pepper sprayed plaintiff, plaintiff contends he laid down on the ground and proned out.

50.  Beasley then ordered plaintiff to place his hands behind his back and to cross his legs.

51.  Based on the circumstances, defendant Beasley did not feel that it was safe to approach plaintiff with handcuffs until after pepper spray subdued him.  Plaintiff denies he was a threat because he was laying on the ground with his arms crossed, a non-threatening position.

52.  Plaintiff did not fully comply with Beasley's orders, so Beasley sprayed plaintiff in the facial area with pepper spray.

53.  Beasley gave plaintiff additional orders to put his hands behind his back and to cross his legs, and pepper sprayed plaintiff in the facial area when he failed to comply with those orders completely.  Plaintiff declares that Beasley emptied his pepper spray canister the second and third times he sprayed plaintiff.  (ECF No. 8 at 10, 11.)

54.  Defendant Hanks gave plaintiff additional orders to cross his legs and place his hands behind his back, but plaintiff refused to comply.

55.  Hanks pepper sprayed plaintiff in the face and upper body when plaintiff failed to comply with his orders.  Plaintiff declares that the third and fourth times Hanks sprayed, he emptied his pepper spray canister spraying plaintiff.  (ECF No. 8 at 11, 12.)

56.  Defendant Van Leer heard an officer from Central Control say that there was a code 1 on B yard.

57.  When Van Leer responded to B yard, officers had already formed a skirmish line in the middle of the yard.

11

58.  Van Leer witnessed Beasley and Hanks pepper sprayed plaintiff in the facial area a total of approximately four times.

59.  It did not appear to Young that plaintiff was feeling the effects of the pepper spray when the officers were spraying him.

60.  Young did not see plaintiff coughing.

61.  It did not appear to Young that plaintiff was having any difficulty breathing.

62.  Young did not see any snot or other mucous coming out of plaintiff's nose.

63.  It did not appear to Van Leer that plaintiff was having a physical reaction to the pepper spray when the officers were spraying him.  Plaintiff disputes this fact, as well as facts 64-66, because he argues that based on Van Leer's position behind the skirmish line, it would be difficult for him to observe whether plaintiff was suffering such effects.

64.  Van Leer did not see plaintiff coughing.

65.  It did not appear to Van Leer that plaintiff was having any difficulty breathing.

66.  Van Leer did not see any snot or other mucous coming out of plaintiff's nose.

67.  Van Leer declared that it appeared that plaintiff got in a pushup position on multiple occasions throughout the incident, which made it look like plaintiff was getting ready to spring up and assault if an officer got too close to him.  (ECF No. 34-7 at 5.)  Plaintiff denies that he got in a pushup position at all during this incident.  (ECF No. 40 at 10.)  Plaintiff contends that once he got down on the ground, he never got to his feet until after the incident was over.  (ECF No. 40 at 10.)  No other officer declared that he or she saw plaintiff get up in a pushup position.  (ECF Nos. 34-5; 34-6; 34-8, 34-9, & 34-10.)

68.  It was Van Leer's belief that had officers attempted to restrain plaintiff before the pepper spray took effect, plaintiff would have had a greater ability to resist them, which could have resulted in injuries to officers and to plaintiff.  (ECF No. 34-7 at 7.)

69.  Van Leer ordered Sharp to lead the skirmish line forward to place plaintiff in handcuffs as soon as it appeared to Van Leer that the pepper spray was taking effect on plaintiff.  (ECF No. 34-7 at 7.)

////

70.  Van Leer thought that plaintiff was feeling the effects of the pepper spray when he noticed that plaintiff was no longer able to keep his eyes open and was shaking his head from side to side.

71.  Just before Van Leer ordered officers to place plaintiff in restraints, it appeared to Hanks that plaintiff was squinting and that the pepper spray was starting to bother plaintiff.

72.  It did not appear to Beasley that plaintiff was experiencing the typical reactions of pepper spray exposure to the face, such as a runny nose, inability to see because the eyes close, coughing, or difficulty breathing, when he and other officers were pepper spraying plaintiff.

73.  Just before Van Leer ordered officers to place plaintiff in restraints, it appeared to Beasley that plaintiff may have been feeling the effects of the pepper spray because plaintiff was shaking his head.

74.  Defendants declare that they did not hear plaintiff say that he had knee surgery recently or that the reason he would not cross his legs was because he had knee surgery recently. Plaintiff testified that he told defendants Young and Sharp that plaintiff would not cross his legs because he has bad knees and they hurt, but would cuff up, and contends the other defendants had to hear because they were all in close proximity.  (Pl.'s Depo. at 29.)  Plaintiff claims he "said it loud, [be]cause [he] was angry."  (Id.)

75.  Defendants declare they did not hear any officer say that plaintiff could not or would not cross his legs because he had knee surgery recently or anything to that effect.

76.  Defendants declare that they did not hear any officer say that plaintiff had a mobility impairment.

77.  Plaintiff was not wearing a vest indicating that he had a mobility impairment.

78.  Defendants did not know whether plaintiff had an injured knee or whether crossing his legs would cause pain or harm to his knees.

79.  If an inmate is blind or has a visual impairment, that would not prevent him from obeying verbal orders to prone out, place his hands behind his back, and cross his legs.

80.  After plaintiff was placed in restraints on B yard, he was taken to the Facility B program office for pepper spray decontamination.

13

81.  Plaintiff does not feel that defendants used excessive force when they placed him in restraints on B yard.

82.  Plaintiff's vision is about the same now as it was on July 28, 2009.

83.  Plaintiff did not fully comply with the orders that were given to him.

84.  Registered Nurse Wnuk examined plaintiff about ten minutes after the incident.

85.  Plaintiff did not tell Wnuk what happened on B yard.

86.  Nurse Wnuk declares that plaintiff did not have any physical injuries at the time Wnuk examined him, other than pepper spray exposure to his eyes.[3]

C.   Standards Governing Excessive Force Claims

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment.  See Whitley v. Albers, 475 U.S. 312, 391-21 (1986); see also Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Hudson v. McMillian, 503 U.S. 1, 7-9 (1992).  The use of force by a prison officer violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," Estelle v. Gamble, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'"  Wilkins, 559 U.S. at 38 (citation omitted).

The Eighth Amendment inquiry is focused on whether the "force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson, 503 U.S. at 7; Wilkins, 559 U.S. at 34.  In order to make such determination, the Ninth Circuit has "identified five factors set forth in Hudson to be considered . . . '(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible

////

////

_____

[3]  Wnuk declares that plaintiff did not tell Wnuk that plaintiff was in pain.  (ECF No. 34-4 at 2.) Plaintiff states that Wnuk could "see that plaintiff was in excruciating pain."  (ECF No. 40 at 12.) Plaintiff testified that when defendant Sharp pepper sprayed plaintiff in the face, he felt burning, pain, and was unable to see, and claimed that the effects lasted for about a week.  (Pl.'s Depo. at 25-26, 32, 35.)  Further, plaintiff stated he "had to deal with a period of dizziness," and had "real bad blurriness."  (Pl.'s Depo. at 31.)

1   officials; and (5) any efforts made to temper the severity of a forceful response.'" <u>Furnace v.</u>

2   <u>Sullivan</u>, 705 F.3d 1021, 1028-29 (9th Cir. 2013), quoting <u>Martinez v. Stanford</u>, 323 F.3d 1178,

3   1184 (9th Cir. 2003); <u>see</u> <u>Whitley</u>, 475 U.S. at 321.

4          In addition, the Supreme Court has made clear that "not 'every malevolent touch by a

5   prison guard gives rise to a federal cause of action'" under the Eighth Amendment.  <u>Wilkins</u>, 559

6   U.S. at 37 (citations omitted).  Conversely, the absence of "significant" injury is not dispositive of

7   a claim of excessive force.  <u>See</u> <u>Wilkins</u>, 559 U.S. at 36-37.  But, the extent of an inmate's injury

8   is one factor indicative of whether the force used was necessary in a particular situation.

9   Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because

10  [the plaintiff] had the good fortune to escape without serious injury."  <u>Id.</u> at 37.  Put another way,

11  there is no "de minimis" level of injury that is an acceptable result of excessive force under the

12  Eighth Amendment.  <u>Id.</u> at 38-40; <u>see also</u> <u>Oliver v. Keller</u>, 289 F.3d 623, 628 (9th Cir. 2002)

13  (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis

14  injuries).

15         The Ninth Circuit has ruled that the "use of [tear gas] in small amounts may be a

16  necessary prison technique if a prisoner refuses after adequate warning to move from a cell or

17  upon other provocation presenting a reasonable possibility that slight force will be required."

18  <u>Spain v. Procunier</u>, 600 F.2d 189, 195 (9th Cir.1979).  The court reasoned that in such

19  circumstances, the substance may be a legitimate means to prevent small disturbances from

20  becoming dangerous to other inmates or the prison personnel.  <u>Id.</u>  In <u>Clement v. Gomez</u>, the

21  court found no Eighth Amendment violation where a small amount of pepper spray was used to

22  quell fighting in a cell, even though the spray effected bystander inmates.  298 F.3d 898, 903-04

23  (9th Cir. 2002).

24         "'It is generally recognized that it is a violation of the Eighth Amendment for prison

25  officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for

26  the sole purpose of inflicting pain.'"  <u>Iko v. Shreve</u>, 535 F.3d 225, 240 (4th Cir. 2008) (quoting

27  <u>Williams v. Benjamin</u>, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted).  However, pepper

28  spray is not "per se a cruel and unusual punishment," <u>McCargo v. Mister</u>, 462 F.Supp. 813, 818

1  (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth

2  Amendment.  Williams, 77 F.3d at 763.  The use of pepper spray must be "reasonable under the

3  circumstances," but it must not be "punitive, arbitrary, or malicious."  Treats v. Morgan, 308 F.3d

4  868, 873 (8th Cir. 2002).  The courts are more likely to find that the use of pepper spray was

5  reasonable if the correctional officer could have feared for his or her safety.  Id.  The courts are

6  less likely, however, to find the use of pepper spray reasonable where the prisoner posed no threat

7  to the security of the institution.  Id. at 873-74.  In this context, it is paramount that the Court

8  "view the facts and the inferences to be drawn from them in the light most favorable to

9  [plaintiff]."  Johnson v. Blaukat, 453 F.3d. 1108, 1113 (8th Cir. 2006) (internal quotes and

10  citation omitted).

11  　　　There are three general areas in which courts have held that use of pepper spray or other

12  chemical agents may constitute excessive force in violation of the Eighth Amendment.  First, an

13  Eighth Amendment violation has been found when an officer used far more than a reasonable

14  quantity of a chemical agent.  See, e.g., Furnace, 705 F.3d at 1025 (finding Eighth Amendment

15  violation where officer discharged can of pepper spray until empty, and another officer joined in);

16  Lawrence v. Bowersox, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was

17  doused in pepper spray using fire-extinguisher-like device); DeSpain v. Uphoff, 264 F.3d 965,

18  978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

19  　　　Second, Eighth Amendment violations have also been found when a chemical agent was

20  used without a prior verbal command, or after a prisoner had been subdued or had become

21  compliant with an officer's instructions.  See Tedder v. Johnson, 527 F. App'x 269 (4th Cir.

22  2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force);

23  Blaukat, 453 F.3d. at 1108 (finding triable Eighth Amendment claim where officers allegedly

24  used pepper spray as a first resort without prior warning); Treats, 308 F.3d at 872 (finding triable

25  Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey

26  [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was

27  [pepper] sprayed without warning").

28  ////

Third, courts have concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention.  See, e.g., Walker v. Bowersox, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); Norton v. City of Marietta, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if " 'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); Foulk v. Charrier, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The Fourth Circuit's decision in Iko, involving use of pepper spray in extracting an inmate from his cell, illustrates each of the three categories.  There, the court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'"  Id., 535 F.3d 239.  Nevertheless, the court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," id. at 239-40; the inmate was "docile and passive throughout the cell extraction," id. at 239; the officer's "final burst of pepper spray was deployed *after* [the inmate] had lain down on the floor of his cell," id. at 240; and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure."  Id.

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable.  See Williams, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered small quantity of pepper spray after prisoner

1   asked "Why?" in response to command); Jackson v. Morgan, 19 F. App'x 97, 102 (4th Cir. 2001)

2   (upholding use of twelve bursts of pepper spray at three different times when inmate refused to

3   comply with repeated commands to move from his cell); Norris v. Detrick, 918 F.Supp. 977, 984

4   (N.D. W.Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to

5   his cell during lockdown).  Use of chemical agents is reasonable when a prisoner attempts to

6   escape or evade an officer's control.  See Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999).

7   Finally, use is also reasonable when an officer is attempting to maintain order and discipline in

8   the institution.  Santiago v. Walls, 599 F.3d 749, 757 (7th Cir. 2010) (determining that Eighth

9   Amendment was not violated where pepper spray was used to break up inmate fight); Combs v.

10  Wilkinson, 315 F.3d 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot

11  appropriate).

12          D.  Discussion

13          In determining whether defendants used excessive force against plaintiff, the court must

14  credit plaintiff's version of events.  Furnace, 705 F.3d at 1026-27.  "Summary judgment is

15  appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light

16  most favorable to the non-moving party, there are no genuine issues of material fact and the

17  moving party is entitled to judgment as a matter of law."  Furnace, 705 F.3d at 1026 (quoting

18  Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011)).  The law in this Circuit is clear

19  that the use of chemical agents in quantities greater than necessary to restore order or for the sole

20  purpose of infliction of pain violates the Eighth Amendment.[4]  It is also clear that the use of

21  pepper spray in small amounts may be a necessary technique for the control of prisoners if a

22  prisoner refuses after adequate warning to comply with the lawful order of a guard, or in any

23  other situation presenting a reasonable possibility that slight force will be required.[5]

24          Here, the pepper spraying occurred outside on the yard.  The extent of injury allegedly

25  suffered by plaintiff was moderate; in addition to suffering pain and burning in his eyes, plaintiff

26

27  [4]  Furnace, 705 F.3d at 1028, citing Hudson, 503 U.S. at 6.

28  [5]  Furnace, 705 F.3d at 1028, citing Spain, 600 F.2d at 195.

18

1   claims the effects lasted for about a week, and that he had to deal with a period of dizziness and

2   had "real bad blurriness."  (Pl.'s Dep. at 25-26, 32, 31, 35.)  Moreover, it can be inferred from the

3   record that plaintiff was concerned that the pepper spray would seriously damage his already

4   impaired eyesight.  Plaintiff's injuries reflect that despite the eight or nine canisters of pepper

5   spray that he alleges were sprayed on him, he suffered typical, but not long-term or severe,

6   injuries expected from being pepper sprayed.  Some of the effects may have been ameliorated by

7   the distance from which the spray was administered, as well as plaintiff turning his back to the

8   spray.  Plaintiff adduced no evidence demonstrating that he sustained worse injuries due to his

9   medical conditions underlying his vision impairment, or due to the large volume of pepper spray

10   used.  However, although proof of injury is relevant to the constitutional inquiry, such proof is not

11   required.  Hudson, 503 U.S. at 7 ("The absence of serious injury is . . . relevant to the Eighth

12   Amendment inquiry, but does not end it.").

13        Unlike other cases where pepper spray was administered, during this incident, there were

14   no inmates fighting, no prison riots, or other violent activities going on.  Rather, plaintiff verbally

15   confronted defendant Young on the yard, and when Young felt plaintiff verbally threatened him,

16   Young called for the tower guard (Boyd) to bring the inmates on the yard to the ground.  In

17   Officer Boyd's report, he stated that in response to his order, all the inmates got down.  Plaintiff

18   claims he got down.

19        It is undisputed that while plaintiff was proned out, he was pepper sprayed by defendant

20   Sharp when plaintiff refused to cross his legs.  Thus, a fact finder could find that it was excessive

21   for Sharp to empty his pepper spray canister while plaintiff was laying on the ground, particularly

22   in the absence of evidence demonstrating that plaintiff was physically resisting or kicking or

23   verbally threatening.  Also, plaintiff testified that he told defendants Sharp and Young that he

24   would not cross his legs because he had bad knees, but that he would cuff up.  Defendants declare

25   they did not hear plaintiff make such a statement.[6]  In light of plaintiff's deposition testimony,

---

[6]  In his deposition, plaintiff testified that he told defendants Sharp and Young that he had bad

27   knees and would not cross his legs but would cuff up.  (Pl.'s Depo. at 24, 29.)  Defendants point
    out that plaintiff does not allege in his complaint, his declaration, or his opposition that he

28   informed defendants that he was unable to cross his legs because he had recently undergone knee

1    and viewing the evidence in the light most favorable to plaintiff, arguably he attempted to comply

2    with the orders by proning out and crossing his arms, despite his failure to cross his legs.

3           In any event, it is undisputed that plaintiff remained on the ground during the entire

4    incident, either sitting on his buttocks or lying prone.  Thus, there is a question of material fact as

5    to whether plaintiff was "subdued," such that the initial administration of an entire canister of

6    pepper spray was inappropriate.  Such an inference can be made where plaintiff claims he was

7    prone on the ground with his hands behind his back when defendant Sharp pepper sprayed him in

8    the face and eyes, simply because plaintiff would not cross his legs.  Similarly, these

9    circumstances demonstrate that there remains a question of fact as to the threat reasonably

10   perceived by defendants.

11          Defendants contend that they were justified in using pepper spray because of plaintiff's

12   repeated refusals to obey their orders, and that they did not know plaintiff's intentions.  Certainly,

13   in the prison setting, inmates are not allowed to pick and choose those orders they will obey.

14   Correctional officers are not required to concede to the demands of inmates or wait them out in

15   order to avoid the use of force.  Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) ("experience

16   and common sense establish that a prison cannot be operated in such a way.").  Indeed, the Ninth

17   Circuit has held that the policy of spraying prisoners with pepper spray for refusing to follow

18   directions falls within the wide ranging zone of deference accorded to prison officials in shaping

19   preventive measures intended to reduce incidents of breaches of prison discipline.  Stewart v.

20   Stewart, 60 F. App'x 20, 22 (9th Cir. 2003).  "Likewise, allegations that the administrators

21   authorized corrections officers to dispense pepper spray across entire pod areas whenever an

22   individual prisoner acts in a disruptive manner, and that they authorized the use of an 'Israeli

23   fogger' device, both fail to show that excessive force was used."  Id.  Thus, plaintiff's undisputed

24   refusal to obey orders demonstrates that defendants were justified in using some measure of force

25   because plaintiff did not readily comply with all of defendants' orders.

26   _____

27   surgery, or that defendants had any reason to know he was unable to cross his legs for that reason.
     (ECF No. 43 at 2.)  However, this court cannot determine questions of credibility on summary
28   judgment.

However, since <u>Stewart</u>, the Ninth Circuit noted that the "quantity of pepper spray discharged by the officers is unquestionably material, because the amount of force is central to a claim sounding in the alleged use of excessive force." <u>Furnace</u>, 705 F.3d at 1026 (genuine issue of material fact regarding whether the amount of pepper spray used by prison officials to subdue inmate was excessive, given that the inmate only posed a minimal threat and prison officials sprayed inmate for approximately 60 seconds; reversed summary judgment for defendants and remanded to district court to address this question); <u>Rangel v. La Traille</u>, 2014 WL 4163599 (E.D. Cal. Aug. 20, 2014) (triable issue of material fact existed regarding whether or not the use of multiple canisters of pepper spray was necessary to gain his compliance with the order to submit to an unclothed body search and whether or not defendants continued to spray Rangel after he attempted to comply with orders).

Here, following the initial application of one canister of pepper spray, it is undisputed that plaintiff was pepper sprayed at least an additional six times.  Defendants do not explain how much pepper spray was subsequently used, but plaintiff contends eight to nine canisters were used during the incident.  (Pl.'s Dep. at 23, 41.)  It is also undisputed that plaintiff remained on the ground for the duration of the incident; and plaintiff claims that although he sat up to avoid the spray getting in his eyes, he immediately proned back out, and he did not attempt to get to his feet.  Viewing the evidence in the light most favorable to plaintiff, a jury could find that pepper-spraying a visually-impaired prisoner with an entire can of pepper spray in his face and eyes while he was prone on the ground with his hands crossed behind his back was excessive.  A jury could also find that once the first few cans of pepper spray allegedly had no effect on plaintiff, as argued by defendants, the subsequent and repeated applications of pepper spray could be viewed as malicious or sadistic, particularly where defendants aver that some people do not respond to pepper spray at all.  A jury could also find that pepper spraying an inmate with eight or nine canisters of pepper spray, while he remains on the ground, either sitting or prone, was an excessive use of force.  Moreover, a jury could even find that it was not necessary to pepper spray an inmate at all when he was prone on the ground and as many as five corrections officers were present.

1    For these same reasons, there is a triable dispute of material fact whether the perceived

2    threat warranted the force imposed.  A jury could find that defendants reasonably perceived a

3    threat, but not one that justified the use of multiple cans of pepper spray.

4    Finally, defendants contend that their use of pepper spray was appropriate under the

5    circumstances, relying on Banks v. McDonald, 81 F. App'x 227, 228 (9th Cir. 2008).  In Banks,

6    the Ninth Circuit affirmed the district court's grant of summary judgment to McDonald because

7    plaintiff "presented no facts to support that being sprayed six or seven times for refusing orders to

8    cuff up constituted excessive force," and the "undisputed evidence shows that McDonald warned

9    Banks that refusing to cooperate would result in his being sprayed and that McDonald stopped

10   spraying Banks once he complied."  Id.  In Banks, a prisoner in his cell, in an angry and upset

11   state, intentionally threw his television on the cell floor and told Officer Robison that "someone

12   was going to get hurt."  Banks v. McDonald, Case No. CV-01-341, at 7 (D. Ariz. March 14,

13   2003) (ECF No. 65 at 7).  After plaintiff refused a direct order to cuff up, McDonald was given

14   approval to use chemical agents by a Captain and Lieutenant, who were both present.  Id.

15   McDonald again ordered Banks to cuff up and warned him that she would spray him, and after

16   giving [Banks] ample time to comply, [McDonald] directed a burst of chemical agents into

17   [Banks'] cell."  Id. at 8.  Banks alleged he was sprayed with seven riot sized cans of gas.  Id. at 2.

18   However, Banks differs from the instant case in several key ways.  It appears that Banks

19   was standing and refusing to cuff up.  Here, plaintiff declares he was on the ground at all times,

20   was willing to be cuffed, was not physically resisting or verbally threatening, and never attempted

21   to get to his feet.  Indeed, it is undisputed that plaintiff was lying prone on the ground with his

22   hands crossed behind his back the first time he was sprayed with an entire canister of pepper

23   spray.  In Banks, the pepper spray was sprayed into the prisoner's cell.  Here, the pepper spray

24   was sprayed into plaintiff's face and eyes.  Moreover, plaintiff contends he was subsequently

25   sprayed while he was prone on the ground and only sat up during the spray in an attempt to keep

26   the spray out of his eyes.  Finally, in Banks, the prisoner was warned before the pepper spray was

27   ////

28   ////

22

sprayed.  Here, there is no evidence that plaintiff was warned before the pepper spray was used.[7]

It is unknown whether plaintiff, a visually-impaired inmate, would have attempted to cross his

legs despite his knee pain had defendants first warned him that they were going to pepper spray

him (although presumably not, since he still refused to cross his legs even after being pepper

sprayed multiple times).

     After giving warning, the use of a small amount of pepper spray to control a recalcitrant

inmate has been found not to violate the Eighth Amendment.  See Howard v. Nunley, 465 F.

App'x 669 (9th Cir. 2012) (defendant Nunley properly granted qualified immunity on summary

judgment regarding the use of pepper spray because it was uncontested that Howard disobeyed an

order to stop pounding on his cell door after he also received a warning that failure to comply

would result in the use of pepper spray); Spain, 600 F.2d at 195 (use of small amounts of tear gas

after adequate warning may be a necessary prison technique where an inmate refuses to move

from a cell); Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) (where inmate told he would be

maced if he refused, court held use of mace to obtain compliance of inmate who failed to comply

with multiple orders to come to the front of his cell and cuff up was reasonable response whether

the inmate is locked in a cell or handcuffed); Robins v. Lamarque, 2011 WL 6181435, at *5

(N.D. Cal. Dec. 13, 2011) (after ordering inmates to remove papers covering cell windows and

telling them if they did not comply, an extraction team would use pepper spray and/or physical

force, court found two blasts of pepper spray and smoke grenades used to extract inmates from

cell did not violate Eighth Amendment).  Here, it does not appear that plaintiff was warned that

pepper spray would be used, and it is undisputed that it was not a small amount of pepper spray

that was used.

     On the other hand, there is evidence that defendants tempered their use of force, by

continuing to issue verbal orders to plaintiff to prone out and cross his arms and legs prior to

---

[7]  Although both parties cite cases in which the inmate was warned that pepper spray would be
used prior to its use, neither party addressed whether, under these circumstances, defendants were
required to warn plaintiff that pepper spray would be used prior to its use.  (ECF No. 34-1 at 9; 40
at 16.)  But it is undisputed that defendants issued verbal orders to plaintiff prior to each use of
pepper spray.

1    using the pepper spray.  Defendants also argue that the use of pepper spray risked less injury to

2    them and to plaintiff than the use of their batons.  (ECF No. 34-8 at 2.)  Moreover, it is

3    undisputed that plaintiff was allowed to wash the pepper spray off following the incident, and he

4    received medical care thereafter.  Thus, as in <u>Furnace</u>, this factor favors defendants.  <u>Id.</u>, 705 F.3d

5    at 1030.

6         In conclusion, viewing the evidence in the light most favorable to plaintiff, because there

7    are triable issues of material fact as to three of the five <u>Hudson</u> factors, defendants Sharp, Fish,

8    Hanks, and Beasley are not entitled to summary judgment.

9                        2.  <u>Alleged Failure to Protect</u>

10        Plaintiff alleges that defendants Young and Van Leer were deliberately indifferent to

11   plaintiff's safety, and failed to protect plaintiff, by failing to intervene and stop the multiple

12   applications of pepper spray.  Defendants contend that they were not deliberately indifferent to a

13   substantial risk of serious harm because they pepper sprayed plaintiff to gain his compliance with

14   orders, and he did not face a substantial risk of serious harm because, based on their training and

15   experience, they understood that there are no long-term effects experienced by people who are

16   exposed to pepper spray.

17        A prisoner's rights can be violated by a prison official's deliberate indifference by failing

18   to intervene.  <u>Robins v. Meecham</u>, 60 F.3d 1436, 1442 (9th Cir. 1995).  Prison officials are

19   required "to take reasonable steps to protect inmates from physical abuse."  <u>Hoptowit v. Ray</u>, 682

20   F.2d 1237, 1250 (9th Cir. 1982) (<u>abrogated on other grounds by</u> <u>Sandin v. O'Connor</u>, 515 U.S.

21   472 (1995)).  To state a claim the plaintiff must show that the defendants acted with deliberate

22   indifference.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (citations omitted).

23   Deliberate indifference requires a showing that "prison officials were aware of a "substantial risk

24   of serious harm" to an inmate's health or safety and that there was no "reasonable justification for

25   the deprivation, in spite of that risk."  <u>Id.</u> (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 844

26   (1994)).  Additionally, an officer can only be held liable for failing to intercede if he had a

27   realistic opportunity to intercede and failed to do so.  <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1289-

28   90 (9th Cir. 2000).

1    Here, there are disputed issues of fact as to whether defendants used excessive force by

2    pepper spraying plaintiff with a canister of pepper spray while he was prone on the ground, as

3    well as pepper spraying him with seven or eight more canisters of pepper spray while he

4    remained on the ground, either sitting or lying down.  Because there are genuine disputes of fact

5    as to whether defendants Sharp, Fish, Hanks, and Beasley used force maliciously or sadistically

6    for the purpose of causing harm, such disputes of fact also preclude summary judgment on the

7    issue of whether defendants Young and Van Leer failed to intervene.  Viewing the evidence in the

8    light most favorable to plaintiff, a jury could infer that defendants Young and Van Leer had

9    opportunities to intervene yet failed to do so.

10    Defendants argue that at least one district court has held that exposure to "pepper spray

11    does not create a serious medical need because it causes only temporary discomfort."  Heilman v.

12    Fry, 2009 WL 3287734, *5 (E.D. Cal. Oct. 6, 2009).  Plaintiff argues that because he is vision-

13    impaired, and because he was wearing his vest indicating his vision impairment at the time of the

14    incident, defendants should have known plaintiff was at risk of substantial harm.

15    The court is not persuaded by defendants' argument.  First, the defendants' position is that

16    they can disperse any amount of pepper spray in order to obtain an inmate's compliance.  Here,

17    viewing the evidence in the light most favorable to plaintiff, the officers used eight or nine

18    canisters of spray and only stopped spraying once plaintiff appeared to discharge mucous or begin

19    coughing.  This begs the question whether defendants would have continued to pepper spray

20    plaintiff without limit, using ten canisters?  Twenty?  A reasonable officer could not believe that

21    the alleged unfettered use of pepper spray was appropriate.  Second, the question here is whether

22    defendants were required to intervene where other officers were using force while the inmate was

23    on the ground and arguably not resisting, not whether suffering exposure to pepper spray

24    constitutes a serious medical need in violation of the Eighth Amendment.  Third, while it may be

25    true that routine applications of small amounts of pepper spray do not pose a substantial risk of

26    harm because the effects are temporary, there have been incidents of more serious injuries where

27    inmates have preexisting medical conditions and pepper spray is involved.  See, e.g., Parsons v.

28    Ryan, 754 F.3d 657, 667 n.9 (9th Cir. 2014) (two inmates with asthma suffered asthma attacks

1   from the regular use of pepper spray in the women's suicide watch unit); Frazier v. Redding

2   Police Dept., 2013 WL 4737201, *1 (E.D. Cal. Sept. 3, 2013) (suspect suffered "bout of asthma

3   from the pepper spray"); Sandoval v. Hish, 461 F. App'x 568 (9th Cir. 2011) ("mentally ill

4   individual died as a result of positional asphyxia associated with restraint after defendants used

5   pepper spray and physical restraints to purportedly subdue him.")

6       For all of the above reasons, defendants Young and Van Leer are not entitled to summary

7   judgment.

8       D.   Qualified Immunity

9       Defendants argue that they are entitled to qualified immunity because it is undisputed that

10  plaintiff was disobeying orders, and officers are authorized to use force, including pepper spray,

11  to gain an inmate's compliance with orders; thus, their use of pepper spray was not excessive, and

12  defendants Young and Van Leer were not required to intervene.

13      Qualified immunity shields government officials from civil damages unless their conduct

14  violates "clearly established statutory or constitutional rights of which a reasonable person would

15  have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity balances

16  two important interests – the need to hold public officials accountable when they exercise power

17  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

18  perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects

19  "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475

20  U.S. 335, 341 (1986).

21      In resolving the claim of qualified immunity, the court must determine whether, taken in

22  the light most favorable to plaintiff, defendants' conduct violated a constitutional right, and if so,

23  whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 (2001);

24  Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009). Courts have discretion to address the two-

25  step inquiry in the order deemed most suitable under the circumstances. Pearson, 555 U.S. at 236

26  (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the

27  second step is reached only if the court first finds a constitutional violation); Mueller v. Auker,

28  576 F.3d at 993-94.

1    A right is clearly established if "it would be clear to a reasonable [official] that his

2    conduct was unlawful in the situation he confronted . . . or whether the state of the law [at the

3    time of the violation] gave fair warning to the official[ ] that [his] conduct was [unlawful]."

4    Clement, 298 F.3d at 906 (internal quotation marks and citations omitted).  This does not require

5    that the same factual situation must have been decided, but that existing precedent would

6    establish the statutory or constitutional question beyond debate.  Id.; Nelson v. City of Davis, 685

7    F.3d 867, 884 (9th Cir. 2012).

8    By 2008, the prohibition against the use of excessive force was clearly established.

9    Hudson, 503 U.S. at 6-7.  The malicious and sadistic use of force to cause harm always violates

10   contemporary standards of decency, whether or not significant injury is evidence.  Id. at 9.  No

11   reasonable officer would have believed that pepper spraying an inmate so that he was drenched in

12   pepper spray, without any provocation, was force "applied in a good-faith effort to maintain or

13   restore discipline. . . ."  Id. at 7.  While a resolution of the factual issues may relieve defendants of

14   any liability in this case, if plaintiff's version of the facts prevailed at trial, a jury might conclude

15   that defendants Sharp, Fish, Hanks and Beasley used excessive force, and that defendants Young

16   and Van Leer should have intervened.  Viewed in the light most favorable to plaintiff, defendant

17   Sharp emptied his pepper spray canister on plaintiff after he proned out and crossed his arms

18   behind his back, and after plaintiff allegedly told Young and Sharp that he had bad knees and

19   would not cross his legs and would cuff up, and defendants continued to pepper spray plaintiff,

20   perhaps emptying seven or eight more canisters, while plaintiff was on the ground, and not

21   kicking, physically resisting, attempting to stand up, or verbally threatening.  Thus, given the

22   above disputes of material fact, defendants are not entitled to qualified immunity.

23   IV.  Conclusion

24   In accordance with the above, IT IS HEREBY RECOMMENDED that defendants'

25   motion for summary judgment (ECF No. 34) be denied.

26   These findings and recommendations are submitted to the United States District Judge

27   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

28   after being served with these findings and recommendations, any party may file written

1   objections with the court and serve a copy on all parties.  Such a document should be captioned

2   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

3   objections shall be filed and served within fourteen days after service of the objections.  The

4   parties are advised that failure to file objections within the specified time may waive the right to

5   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6   Dated:  July 30, 2015

7

8   _____
    KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

9

10  /will0318.msj

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28